IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2008

## CURTIS TATE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 01-02543     Lee V. Coffee, Judge**

---

**No. W2007-02509-CCA-R3-PC  - Filed January 23, 2009**

---

The Petitioner, Curtis Tate, appeals from the Shelby County Criminal Court's order denying his petition for post-conviction relief.  The Petitioner was convicted by a jury of second degree murder and, thereafter, sentenced to twenty years in the Department of Correction.  On appeal, he argues that the denial of post-conviction relief was error because he did not receive the effective assistance of counsel at trial.  He submits that trial counsel failed to call several crucial witnesses to establish his self-defense claim and that trial counsel was impaired during trial because of alcohol use. Following our review of the record and the parties' briefs, we conclude that the Petitioner has not shown that he is entitled to relief.  The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

James O. Marty, Memphis, Tennessee, for the appellant, Curtis Tate.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Pritchard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

The Petitioner was indicted for second degree murder following the shooting death of Stephen Ward.  A jury convicted the Petitioner as charged, and he received a twenty-year sentence. On direct appeal, this Court summarized the facts established at the Petitioner's trial:

The instant case arises from the shooting death of the victim, Stephen Ward. At approximately 11:00 p.m. on November 8, 2000, the victim's brother, Michael Ward, was awakened by the victim as he arrived home from work.  The victim ran

into the house, screaming that Artavius Thompson had attempted to force his vehicle off the road. Seconds later, Thompson arrived at the Wards' house and parked his "light-colored" Toyota in the driveway. The victim and Michael ran to the front door and looked out. Michael observed four individuals, including Thompson, in the vehicle. The other individuals were later identified as Terrell McGaughy, Shaquita Clemons, and the [Petitioner]. As the victim ran outside to confront Thompson, Michael returned to his room to put on his shoes. Michael heard the victim and Thompson arguing. Thereafter, a fight ensued.

When Michael finished putting on his shoes, he ran outside. McGaughy got out of the passenger side of the vehicle and confronted Michael. After the men "had a few words," McGaughy ran to the driver's side of the vehicle and drove the car onto the street. He then got out of the car and approached Michael, who was standing in the street. McGaughy attempted to strike Michael, and the two men began fighting. When the victim observed Michael and McGaughy fighting, he ran to assist Michael. The victim chased McGaughy around the front of Thompson's vehicle, and Michael ran towards the rear of the vehicle. When McGaughy reached the passenger door, he opened the door and "d[o]ve into the car." As the victim attempted to grab McGaughy, the [Petitioner], who was sitting in the backseat, said, "Hey, man, you got my friend f***ed up." The [Petitioner] was referring to Thompson, who, as a result of the fight, was lying in the street. The [Petitioner] then shot the victim.

According to Michael, he and the victim were knocked to the ground by the shotgun blast. As Michael stood up, he saw the victim grab his chest and fall to his knees. Michael grabbed the victim and dragged him towards the house. When they reached the driveway, the victim pushed Michael away and fell to the ground. Michael ran into the house and retrieved his .380 caliber pistol from underneath his bed. When he returned, Thompson was getting into his vehicle and driving away. Michael fired three shots at the vehicle and then ran to the victim and held him as he died. After the victim died, Michael ran behind the house and threw his pistol over the fence.

At trial, Michael's girlfriend, Lacy Jackson, testified that on the night of the instant offense she was spending the night with Michael. She heard the victim outside arguing with Thompson. According to Jackson, the victim asked Thompson, "[W]hy you try to run me off the road." Thompson denied that he attempted to force the victim from the road. Thereafter, Jackson looked out the front door. Thompson's vehicle was parked in the driveway, and the victim and Thompson were fighting in the yard. Jackson went upstairs to wake the victim's mother, Carolyn Ward. When Jackson came back downstairs, Thompson's vehicle was parked in the street. Michael was standing in the street, and the victim and Thompson were fighting. Suddenly, Jackson heard a gunshot and saw a "flash" from the backseat of Thompson's vehicle. Michael and the victim fell to the ground. They then stood and

ran towards the house before again falling to the ground. Michael shouted that the victim had been shot. As Jackson telephoned 911, she heard three more gunshots.

The victim's mother, Ms. Carolyn Ward, testified at trial that on the night of the instant offense she was awakened by Jackson who was upset because "some guys had come to the house." Ms. Ward followed Jackson downstairs. Michael put on a pair of shorts and went outside. Ms. Ward looked out the front door and observed Thompson's vehicle parked in the driveway. Nearby, Thompson and the victim were fighting. Ms. Ward shouted at the victim and Michael to come inside the house. Thereafter, she made several unsuccessful attempts to telephone 911. After one such attempt, Ms. Ward heard a gunshot and ran to the front door. She observed Michael "somewhat carrying" the victim to the house, shouting, "[You] didn't have to shoot him." Ms. Ward went to the back bedroom and telephoned 911. She then heard several more gunshots. When she returned to the front door, the victim, who had been shot, was lying in Michael's arms. He died at the scene.

At trial, Randy Booker testified that on November 9, 2000, McGaughey and three other individuals came to his apartment and asked him to hide a sawed-off shotgun until the next morning. Booker agreed and placed the shotgun under his mattress. Homicide officers subsequently came to his apartment and retrieved the weapon.

Officers discovered Michael's .380 caliber pistol near the fence behind the Wards' house. The pistol had two live rounds in the cartridge. Sergeant T.J. Helldorfer of the Memphis Police Department testified at trial that during his investigation he interviewed Thompson. Thompson directed officers to Booker's apartment where the murder weapon was located. Thompson also provided directions to the Autumn Woods Apartments where the [Petitioner's] father lived. When officers arrived at the apartment, the [Petitioner] answered the door and was taken into custody.

State v. Curtis Tate, No. W2003-00217-CCA-R3-CD, 2005 WL 940575, at *1-2 (Tenn. Crim. App., Apr. 22, 2005) (footnote omitted) (designated "Not for Citation"); perm. app. denied, (Tenn. Oct. 31, 2005).

Following his conviction and the denial of his direct appeal, the Petitioner filed a petition for post-conviction relief, alleging that his trial counsel was constitutionally ineffective.[1] As specific grounds for relief, the Petitioner averred that trial counsel failed to adequately investigate his case; failed to adequately communicate with the Petitioner; failed to call multiple, known witnesses to testify in support of the Petitioner's self-defense theory; and that, due to trial counsel's substance abuse problem, he received ineffective assistance.

---

[1] Counsel was appointed to represent the Petitioner in his post-conviction action, but no amended petition was filed.

A hearing was held in the post-conviction court at which the Petitioner and trial counsel were the only witnesses. Trial counsel stated that he had tried four or five homicide cases prior to being approached by the Petitioner's family about representing the Petitioner. When asked what defense he formulated for the Petitioner, trial counsel responded that he attempted to defend the shooting "as either voluntary manslaughter and/or self-defense."

Trial counsel was aware of the other individuals in the vehicle on the night of the shooting and stated that he interviewed these persons. According to trial counsel, these witnesses gave conflicting stories: one of the witnesses informed him that the victim had a gun during the altercation, while another witness claimed that it was Michael Ward brandishing a gun before his brother was shot. Trial counsel relayed that he did not call these witnesses because of their inconsistent statements "and other things that concerned [him] about calling them and putting them on" at trial. They gave inconsistent statements, and trial counsel opined that their testimony may have led the jury to infer that the Petitioner went to the home intending to shoot the victim. Trial counsel decided to put these witnesses on at the sentencing hearing "[t]o mitigate the offense."

Trial counsel testified that Michael Ward initially claimed he did not have a weapon on that evening but that Michael later changed his story when the police returned a second time and recovered the weapon in some leaves behind the Wards' home. According to trial counsel, Michael admitted, at trial, to having a weapon out there that evening, and trial counsel pointed this out to the jury.

Michael Ward, the Ward's mother, and Michael's girlfriend gave inconsistent statements about when Michael had the pistol in his possession during the altercation, his mother testifying that Michael never had a weapon at all. Based upon the conflicting testimony in the State's proof, the intent was to "try the State's case and point out the inconsistencies, since the burden of proof was on them." Trial counsel confirmed that they did not put on any independent proof regarding the Petitioner's theory and "just argued" self-defense to the jury.

When the Petitioner left the scene of the shooting, he went to his father's house. Trial counsel relayed that he interviewed the Petitioner's father. Trial counsel confirmed that he did not call the Petitioner's father to take the stand at trial.

Trial counsel confirmed that he advised the Petitioner, eighteen years old at the time of trial, not to testify in his own defense. Trial counsel was aware that the Petitioner had no criminal record at the time he committed the offense. When asked why he advised the Petitioner not to testify, trial counsel replied that the "strategy was to try the State's case and make them carry their burden." The advice not to testify was also based in part on "that it would be hard to explain or to justify to the jury why [the Petitioner] was . . . carrying around a shotgun that day . . . ." In the trial court, counsel questioned the Petitioner on the record as to whether he wished to testify, and the Petitioner affirmed that he was informed of his right to testify and was freely and voluntarily waiving that right.

Trial counsel was questioned about a substance abuse problem at the time of the Petitioner's trial. When asked if he had a problem, trial counsel replied,

-4-

> I don't know. I can explain it to you this way as the best way I know to tell you. During the course of his trial, was I drinking in the trial? The answer is no. According to my subsequent thirty—twenty-eight days in rehabilitation and AA, they say if you drink more than five drinks in a week, you have an alcohol abuse problems. Under those guidelines, then, yes. I had an alcohol abuse problem.

Trial counsel stated that he did not drink anything during the Petitioner's trial. Trial counsel confirmed that he did not inform the Petitioner or the Petitioner's family of his alcohol problem. He estimated that he had a substance abuse problem for approximately ten years prior to the Petitioner's trial.

Trial counsel acknowledged that, while he was representing the Petitioner on direct appeal, he was suspended from the practice of law. According to trial counsel, he had "quit practicing law altogether . . . . It was called abandonment of practice." When asked if his suspension was due to his alcohol abuse, trial counsel responded that he was sure the problem "certainly contributed" to his behavior. Trial counsel was currently working as the Academic Dean for ITT Technical Institute in Memphis.

On cross-examination, trial counsel confirmed that he had received discovery from the State at trial. He received a diagram of the crime scene and reviewed it with the Petitioner. He met with the Petitioner and his family to discuss the case and interviewed witnesses. Trial counsel testified that Thompson made some statements to the police following the shooting, wherein "some rather derogatory language" was used in reference to the deceased—"we smoked that nigger." Trial counsel could not recall whether this statement was attributable to the Petitioner or Thompson, but the statement factored into trial counsel's decision not to call Thompson as a witness at trial. Moreover, trial counsel stated that the Petitioner participated in discussions about his defense.

When questioned by the post-conviction court, trial counsel opined that calling Thompson and the other the passengers of the vehicle to testify at trial could have "hurt" the Petitioner's defense. Trial counsel further asserted that he discussed this decision with the Petitioner and the Petitioner's family and that the Petitioner understood the rationale behind the decision. Trial counsel stated that, if the Petitioner had insisted on presenting those witnesses or testifying himself, he would have put them on the stand. Trial counsel also agreed that he did not call any character witnesses on behalf of the Petitioner because the State could have impeached these witnesses with other offenses the Petitioner had been charged with following the shooting. Furthermore, the Petitioner's bond was revoked due to the new charges.

Regarding his alcohol use, trial counsel did not believe it affected his ability to represent his clients zealously and, if he had thought so, he would have informed somebody. Trial counsel testified that he never appeared in court under the influence of an intoxicant or alcohol.

Next, the Petitioner testified. At the time of the shooting, the Petitioner was only seventeen years old, and he had dropped out of school following the eighth grade. He stated that, while he was out on bond, he met with trial counsel three times. The Petitioner informed trial counsel of the circumstances surrounding the shooting. The Petitioner claimed that he did not know how to load

or unload the shotgun used in the shooting and that the shotgun "came with" a shell loaded in it. He also asserted that both Wards had a gun during the altercation, were threatening people with their weapons, and reached inside the vehicle "to get ahold of" the Petitioner. The Petitioner stated that he was "frightened for [his] life[.]"

The Petitioner stated that he desired to testify in his own defense and informed trial counsel of his wishes. Trial counsel advised that it would not be in his best interest. Trial counsel never provided a rationale as to why the Petitioner should not testify, but the Petitioner had to trust his advice. He believed that his testimony "may have influenced the jury to acquit" or resulted in a lesser punishment.

According to the Petitioner, trial counsel led him to believe that he was going to call Thompson and the other passengers as witnesses. They were present in the courtroom at trial. When he did not call them, the Petitioner was "shocked" but trusted that trial counsel knew what he was doing. The Petitioner stated that he was not convicted of the new charges that resulted in the revocation of his bond.

When asked if he ever smelled alcohol on trial counsel, the Petitioner stated that he had not but stated that trial counsel "used to sweat and kind of jitter." The Petitioner received a letter from the court informing him that trial counsel had abandoned his appeal. He learned of trial counsel's alcohol problem about the time he received the letter.

On cross-examination, the Petitioner confirmed that trial counsel came to meet with him while he was incarcerated. However, the Petitioner asserted "he never did come see me as much as he should have." He also testified that he never smelled alcohol on trial counsel at trial or during meetings.

The Petitioner also claimed that trial counsel was supposed to visit the crime scene but never did so. Nonetheless, trial counsel did review the photos and diagrams with him. The Petitioner admitted that he was voir dired in court about his decision not to testify and further acknowledged that Thompson and Clemons were present in the courtroom during this colloquy. He was not threatened by trial counsel or forbidden from testifying.

He testified that he bought the shotgun because he lived in a "deadly neighborhood" and that he had known the Wards all of his life. In the time he had known them, fifteen or sixteen years, they had never had any problems.

On redirect examination, the Petitioner was asked about talking to his father following the shooting. The Petitioner eventually told his father about the events and claimed that he acted in self-defense. His father was not called as a witness.

The post-conviction court then questioned the Petitioner. The Petitioner stated that he acquired the shotgun about two weeks before the shooting. The Petitioner relayed that Michael Ward had a gun that day, and the Petitioner clarified that the victim did not have a weapon during the altercation. According to the Petitioner, the victim was reaching into the vehicle, and Michael

had his weapon "aimed at [the Petitioner]." The Petitioner claimed that he was not aiming his gun at anyone and that the "gun just kind of went off." The Petitioner admitted that he discussed these things with trial counsel and his family.

When asked what difference calling these witnesses would have made at trial, the Petitioner stated, "It would have made a big difference, I think, because I would have been able to give them my side of the story and tell them exactly what happened. See, they never got a chance to see through my eyes what happened or through my friends, exactly what happened." The Petitioner claimed that all of the State's witnesses were lying. He admitted that he discussed with trial counsel whether to call Thompson as a witness and that they did not do so because of the statement Thompson attributed to the Petitioner.

After hearing the evidence presented, the post-conviction court denied relief by written order of October 8, 2007. This appeal followed.

## ANALYSIS

On appeal, the Petitioner argues that trial counsel failed to provide the effective assistance of counsel guaranteed him by the United States and Tennessee constitutions. First, the Petitioner argues that trial counsel failed to call three known, "material" witnesses to advance the Petitioner's self-defense claim. Next, he contends that trial counsel was ineffective because counsel suffered from an alcohol problem during his representation of Petitioner.

To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of

two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

Regarding the Petitioner's allegation that trial counsel failed to adequately investigate, interview, present witnesses, and prepare for the defense of the Petitioner, the post-conviction court concluded that the Petitioner was not denied the effective assistance of counsel, reasoning as follows:

> The [P]etitioner failed to produce any witnesses at the evidentiary hearing that would have supported his unfounded allegations of almost seven (7) years. The [P]etitioner was unable to demonstrate how further preparations by his trial counsel might have been helpful. The [P]etitioner failed to provide this [c]ourt with any explanation as to how he was prejudiced by the alleged deficiencies to call witnesses at trial. These alleged self-defense witnesses were subpoenaed by trial counsel and the State of Tennessee. The witnesses were present at trial. Trial counsel and the State declined to call those witnesses because of credibility issues. The witnesses did testify at a sentencing hearing to mitigate punishment against the [P]etitioner. The record clearly reflects that the trial judge had issues with the credibility of those witnesses.
>
> . . . This [c]ourt cannot speculate on what benefit the witnesses might have offered to the [P]etitioner's case, nor may this [c]ourt guess as to what evidence further investigation might have uncovered. Accordingly, the [P]etitioner has failed

to demonstrate prejudice in this regard. The alleged self-defense witnesses were also subpoenaed and present for the evidentiary hearing. The [P]etitioner failed to call those witnesses at the evidentiary hearing so that the post-conviction court could determine the credibility of the witnesses or the value of their testimony.

The [P]etitioner's father was also present at the evidentiary hearing but was not presented as a witness. Any statements made to the [P]etitioner's father a day after the shooting would have been excluded and not admissible for the defense as those statements would have been self-serving declarations. . . .

. . . .

Even had those witnesses been presented during the post-conviction proceeding, this [c]ourt finds that the result would not have been different. This [c]ourt finds that trial counsel properly investigated the [P]etitioner's case and was adequately prepared for the trial of the [P]etitioner's case. The proof, as accredited by the Court of Criminal Appeals and by the [j]ury, is overwhelming against the [P]etitioner . . . .

The court accredits the testimony of trial counsel and finds that the [P]etitioner is not credible. . . .

The post-conviction court finds that trial counsel made an informed and tactical decision not to call witnesses at trial whose testimony would have been unhelpful, untruthful, contradictory and harmful.

The Petitioner argues that trial counsel's failure to call Artavius Thompson, Terrell McGaughy, and Shaquita Clemons, passengers in the vehicle and eyewitnesses to the shooting, "so undermined" his claim of self-defense that he was denied a fair trial. At the post-conviction hearing, his claim of ineffectiveness in this regard centered around the testimony of Thompson and Clemons, presented at the sentencing hearing but not at trial, that "one or both of the Wards displayed a gun during the altercation" and threatened the Petitioner and others inside the car. The Petitioner did not call Thompson, Clemons, or McGaughy at the post-conviction hearing.

The Petitioner's assertion that trial counsel was constitutionally ineffective for failing to call McGaughy as a witness at trial is unsupportable because the Petitioner did not call him as a witness at the post-conviction hearing. See Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). This Court has previously explained that a claim of ineffective assistance for failure to call a witness must fail unless the witness at issue is called to testify at the post-conviction hearing:

When a [post-conviction] petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation

of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel. The same is true regarding the failure to call a known witness. In short, if a petitioner is able to establish that defense counsel was deficient in the investigation of the facts or calling a known witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called.

Id. (citing Strickland, 466 U.S. 668); see also Ricky G. Aaron v. State, No. M2006-01983-CCA-R3-PC, 2008 WL 203394, at *10 (Tenn. Crim. App., Nashville, Jan. 22, 2008) (stating that this Court's holding in Black "is unequivocal: the allegedly favorable witness must be called and must offer favorable testimony at the [post-conviction] evidentiary hearing in order for [a] petitioner to demonstrate prejudice"). The Petitioner did not call McGaughy to testify at the post-conviction hearing.

While Clemons and Thompson did testify at the Petitioner's sentencing hearing, they likewise were not called at the post-conviction hearing and, therefore, the Petitioner has failed to show that trial counsel was deficient or that he was prejudiced because trial counsel did not call any of these witnesses at trial. The post-conviction judge noted that, because these witnesses were not presented at the post-conviction hearing, he was unable to assess their credibility and the potential value of their testimony to the Petitioner at trial. The post-conviction court further recognized that the trial judge "clearly" had issues with Clemons' and Thompson's credibility at the sentencing hearing.

The Petitioner has also failed to demonstrate that trial counsel's strategy not to call these witnesses at trial amounted to ineffective assistance. As the post-conviction court determined, the testimony of these witnesses would have been "unhelpful, untruthful, contradictory and harmful." Trial counsel's strategy was to make the State try its case and carry its burden of proof; trial counsel was validly concerned about prior inconsistent statements of these witnesses, possible impeachment, and derogatory statements given by those witnesses to police officers (which would have been admissible if called to testify). Counsel effectively raised self-defense at the Petitioner's trial and argued this defense to the jury. We affirm the post-conviction court's finding that the Petitioner failed to prove this allegation by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f).

The Petitioner also contends that trial counsel's alcohol abuse at the time of trial rendered counsel's assistance ineffective. The post-conviction court again made detailed findings on the issue (that trial counsel failed to adequately communicate with the Petitioner and provided impaired advice

of counsel as a result of his substance abuse problem) and found that the Petitioner received the effective assistance of counsel, concluding as follows:

> The record of the trial demonstrates that trial counsel did effectively and aggressively cross-examine witnesses called by the State of Tennessee and made appropriate objections.
>
> Trial counsel testified that he met with the [P]etitioner may times and fully advised the [P]etitioner of his constitutional rights. Trial counsel abandoned his practice partly because of an alcoholic abuse problem. Trial counsel insisted that he did not consume alcoholic beverages during the trial because he wanted to make sure that his thoughts and actions were clear and uncompromised. Trial counsel insisted that he was not impaired or under the influence of alcohol during the course of this trial. By trial counsel's definition of "substance abuse" (more than five drinks a week); there are many practicing attorneys who engage in alcoholic abuse weekly.
>
> Trial counsel testified that he discussed the pros and cons of the [P]etitioner testifying at trial. The trial record shows that trial counsel and the trial court conducted a thorough hearing pursuant to <u>Momon v. State</u>, 18 S.W.3d 152 (Tenn. 1992). The record shows convincingly that the [P]etitioner knowingly, intelligently and voluntarily waived his right to testify as a witness in his own defense.
>
> The [P]etitioner admitted that trial counsel had discussed his absolute right to testify as a witness. The [P]etitioner admitted further that he discussed all the facts of this case, never had a problem with trial counsel and did not ever smell an odor of alcohol on the breath or about the person of trial counsel during the course of trial counsel's representation. The [P]etitioner testified at the evidentiary hearing that he felt "compelled not to testify". The [P]etitioner insisted at the evidentiary hearing that trial counsel "never gave me a chance to show my side" because trial counsel "got paid, didn't care. Didn't try to help as hard as he could". The [P]etitioner's statements are not believable and are contradicted by the record of the <u>Momon</u> hearing. The post-conviction court resolves all credibility issues against this [P]etitioner.
>
> There was absolutely no proof presented at the evidentiary hearing to substantiate these allegations; therefore, this issue is without merit. As a former prosecutor, I tried a Murder First Degree case against trial counsel . . . . In the years that I knew trial counsel, I never detected any signs about [trial counsel] that would have convinced me that he was impaired/intoxicated when he appeared in court. The [P]etitioner's trial judge would have been in violation of judicial ethical standards and canons had the trial judge allowed trial counsel to try this case while impaired or suffering from an obvious substance problem. This issue is wholly unfounded.

It is not sufficient to merely attach a cloud of suspicion to counsel by a showing of alcohol or drug abuse during representation of the petitioner. Our courts and other jurisdictions, while

deploring the conduct, have repeatedly said that "alcohol or drug abuse by the defense attorney, without specific proof of its effect on performance, does not merit relief." Brimmer v. State, 29 S.W.3d 497, 510 (Tenn. Crim. App. 1998).

Again, the record supports the post-conviction court's findings. Trial counsel capably cross-examined the State's witnesses, raising a claim of self-defense which was charged to the jury. The proof showed that trial counsel and the Petitioner met to prepare for trial and the lines of communication were open and used by both the Petitioner and his trial counsel, allowing the Petitioner to make well-informed decisions and assist in his defense. The record reflects that the Petitioner knowingly, voluntarily, and intelligently waived his right to testify in his own defense. Trial counsel affirmed that he did not drink during the Petitioner's trial, which testimony the post-conviction court found credible. We conclude that the Petitioner established neither deficient representation by counsel nor prejudice from the shortcomings which he alleged.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the evidence does not preponderate against the factual findings of the post-conviction court. We also agree with the post-conviction court's conclusion that the Petitioner failed to prove by clear and convincing evidence that trial counsel's performance was deficient or prejudicial. Consequently, the decision of the Shelby County Criminal Court to deny the Petitioner post-conviction relief is affirmed.

_____
DAVID H. WELLES, JUDGE